
E-FILED
Tuesday, 18 September, 2007  02:30:52 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

MICHAEL JAY WOODS, et.al.,
          Plaintiff,

vs.                                                      04-1440

RICHARD MORRIS, et al.,
          Defendants.

## PARTIAL SUMMARY JUDGMENT ORDER

This cause is before the court for consideration of the defendants' motion for summary judgement. [d/e 132]. The plaintiffs are proceeding pro se and the court will consider their response to the defendants' statement of facts.

BACKGROUND

This case was originally filed by seven current or former inmates at the Knox County Jail pursuant to 42 U.S.C. §1983 and various other federal laws against six defendants. On January 20, 2005, the court found that the plaintiffs' complaint violated Rule 8 of the Federal Rules of Civil Procedure. *See* January 20, 2005 Court Order. The plaintiff's filed an amended complaint, but also appealed the court's decision to the United States Court of Appeals for the Seventh Circuit. The appeal was dismissed. On November 18, 2005, the court conducted a merit review of the plaintiff's amended complaint.

The court has subsequently dismissed two plaintiffs and granted one defendant's motion to dismiss. *See* March 8, 2006 Court Order; July 27 2006 Court Order; January 4, 2007 Court Order. Therefore, Plaintiffs Michael Woods, Jerry Mabry, Michael Judy, Blake Kallenbach and Carl Holloway have the following surviving claims against Defendants Jail Administrator Richard Morris, Sheriff Jim Thompson and Knox County in their official and individual capacities:

**1) Defendants Morris, Thompson and Knox County were deliberately indifferent to the serious medical needs of Plaintiffs Holloway, Mabry, Judy and Kallenbach.**

**2) Defendants Morris, Thompson and Knox County did not provide adequate heat, clothing, food or grooming for the plaintiffs in violation of the Eighth Amendment.**

**3) Defendants Morris, Thompson and Knox County failed to protect Plaintiff Mabry on July 8, 2004, when the plaintiff was handcuffed to another inmate with a history of assaults and mental illness. The plaintiff was assaulted and injured.**

1

**4) Defendants Morris, Thompson and Knox County violated Plaintiffs Woods and Kallenbach's due process rights when they were placed in punitive segregation without any notice of the charge or formal hearing.**

**5) Defendant Morris and Knox County retaliated against Plaintiffs Mabry, Kallenbach and Woods for either filing grievances or speaking to the media about jail conditions.**

**6) Defendants Morris, Thompson and Knox County denied the plaintiffs meaningful access to the courts when they were denied all writing material and access to legal materials.**

**7) Defendants Morris, Thompson and Knox County violated the First Amendment when they denied the plaintiffs access to all newspapers and media publications without any rational basis.**

**8) All defendants violated the plaintiffs right to counsel by recording conversations between the plaintiffs and their counsel and making the tapes available to jail officials.  The plaintiffs allege the practice interfered with their ability to communicate with counsel.**

**9) Defendants Morris, Thompson and Knox County conspired to deprive the plaintiffs of their constitutional rights under §1983, §1985 and §1986.**

## II. FACTS

The following facts are taken from the defendants' statement of facts and the plaintiffs' response.

PLAINTIFF JUDY

Plaintiff Michael Judy was detained at the Knox County Jail from December 27, 2003 to January of 2005.  Plaintiff Judy says his specific complaints against the defendants relate to his medical treatment.

Plaintiff Judy says he filed out a medical request form on January 12, 2004 indicating that he was a diabetic and had ulcer oozing on his left foot and a sore on his right toe.  The plaintiff had ulcers on his feet prior to coming to the jail and a podiatrist was treating him for these conditions.

In response to the plaintiff's request, he was seen by a nurse on January 13, 2004.  She applied protective dressing to Plaintiff Judy's feet, gave him additional gauze and instructed him to see the doctor the next time he was at the jail.  Plaintiff Judy was treated by the nurse a second time on January 19, 2004.

2

On January 21, 2004, Dr. Johnson examined Plaintiff Judy. The doctor told the plaintiff his foot was not infected but he needed to keep an eye on it. The doctor prescribed an antibiotic for the plaintiff. On January 23, 2004, Plaintiff Judy was taken to the hospital after he reported chest pain. The plaintiff had a bad reaction to the prescribed antibiotic.

On January 24, 26 and 28, 2004, the plaintiff was seen by a nurse at the jail. She cleaned the plaintiff's foot and applied the antibiotic treatment received at the hospital. The plaintiff told the nurse he no longer needed any pain medication because his foot was no longer hurting. Plaintiff Judy saw the nurse on February 2, 2004 for the completion of the antibiotic treatment. The nurse stated that the area was healing well and the plaintiff should keep his leg elevated.

On February 25, 2004, the plaintiff saw the doctor again who prescribed medication for the plaintiff's condition. However, on the next day, the plaintiff filled out another medical request form stating that he was still having some bleeding on his foot.

The nurse examined the plaintiff on March 12, 2004 and noted that the left foot had almost healed, and then began to get worse. She also noted a new pressure area on the plaintiff's outer right foot. The nurse treated the plaintiff's foot and notified the doctor. The plaintiff received an antibiotic.

On April 5, 2004, the plaintiff filled out another medical request stating that his foot was still hurting and that the Tylenol and Ibuprofen he was given was not helping. The plaintiff saw the nurse the next day. The nurse cleaned the area and applied a protective dressing. The plaintiff was seen by the doctor on April 7, 2004. The doctor prescribed another antibiotic for the plaintiff.

On April 14, 2004, the plaintiff returned to the doctor and stated that he was feeling better. His foot was much improved and healing. Unfortunately, four days later the plaintiff's foot and tooth began to hurt so he filled out another medical request form.

On April 28, 2004, the plaintiff saw the doctor and said he was doing better. His foot was improving and he was advised to stay off his foot.

The plaintiff's next medical request form was on May 10, 2004, and stated that while his left foot was healing, his right foot had gotten worse. The plaintiff saw the doctor two days later and the doctor ordered a culture of the plaintiff's right foot. The culture was taken and sent to an outside hospital. On May 27, 2004, the plaintiff learned that he had a staph infection in his foot. Plaintiff Judy was placed in a quarantine area and prescribed an antibiotic.

The plaintiff filed out another medical request form on May 24, 2004 stating that he had spots in his scrotum area. The plaintiff received treatment from the nurse on June 1, 2004. On June 3, 2004, the plaintiff filled out another medical request form. The plaintiff was seen by the nurse four days later and received treatment for all his reported medical conditions. He was also

3

treated by the doctor on June 9, 2004 and stated that he was doing well.

The plaintiff filled out another medical request form on June 14, 2004 asking for treatment for his painful tooth.  He was seen by the nurse the same day and she prescribed Tylenol for the pain.  The plaintiff saw a dentist on June 23, 2004, and his tooth was pulled.

On August 30, 2004, the plaintiff filled out a medical request form stating he was suffering from ear pain.  The plaintiff was seen by the doctor on September 8, 2004 who diagnosed an ear infection and prescribed medication.

On November 17, 2002, the plaintiff filed another medical request form stating his ears were draining fluid and he had sores on his legs.  The plaintiff was seen by the nurse the next day. She did not notice any drainage from the plaintiff's ears.  She did note some small patches of dry skin on the plaintiff's legs.  She applied ointment and cream for the dry skin.

The very next day, the plaintiff submitted another medical request form stating he was having problems with his ears, diabetes and legs.  He again received treatment for those conditions.

On January 4, 2005, the plaintiff complained of a sore back and was seen and treated by the nurse.  The doctor examined the plaintiff's feet again on January 7, 2005.  The plaintiff reported no problems and the doctor observed no abnormalities.

The plaintiff requested and received medical treatment on January 24, 25 and 26 for feeling light headed and a sore toe.  The last medical request form is dated February 14, 2005. The plaintiff wanted the medical staff to ensure that he could bring stockings with him to the Illinois Department of Corrections and his concerns were addressed.

Plaintiff Judy says his only complaint against Defendant Morris is that he felt he should have seen a doctor for his foot prior to January 21, 2004 and he believe inmates should be allowed pain pills when they are requested. (Def. Memo, Judy Depo, p.61-65)

PLAINTIFF MABRY

Plaintiff Mabry was at the Knox County Jail from June 14, 2004 until March 3, 2005. Plaintiff Mabry was appointed a public defender after his arrest.  The attorney represented the plaintiff from June 14, 2004 until July 6, 2004, but the plaintiff chose to represent himself during his criminal trial.

Plaintiff Mabry says he asked to be taken to the law library on July 6, 2004, but was told his requests must be in writing.  The plaintiff says he also asked for certain books to do legal research, but Defendant Morris told the plaintiff that the jail could not provide him with anything other than Chapter 38, the Illinois Criminal Code.   The plaintiff says he was not allowed this book when he requested it because it was in another pod area.  The plaintiff says when he was

4

represented by a public defender, he was able to borrow as copy of the Illinois Criminal Code and had the copy with him in his jail cell.

On July 22, 2002, the Judge in Plaintiff Mabry's criminal trial ordered Defendant Morris to allow the plaintiff to go to the law library. The plaintiff claims he was not taken to the library until sometime between September 10, 2004 and September 13, 2004 and he was only taken on two occasions. In addition, Plaintiff Mabry says he was not able to look at materials in the library because he was shackled at the waist and could not reach the materials. The plaintiff says he asked the escorting officer to get a book for him, but the officer refused.

Plaintiff Mabry says he raised the issue that he was denied access to legal materials in his criminal case, but he was still convicted of the charges. The plaintiff filed a motion for a new trial and during this time he was represented by an attorney that was appointed to represent him *pro bono*. Counsel raised the claim that Plaintiff Mabry was denied access to legal materials in his motion for a new trial, but the motion was denied and the conviction was upheld. The plaintiff says his case is currently on appeal and he has appointed counsel representing him.

Plaintiff Mabry also states there was a period of time in December of 2004 that the jail was cold because the heating/cooling system was not working. The plaintiff says he was forced to sit around in blankets due to the cold. The system was repaired within three to five days, but the plaintiff says the temperatures remained very cold. Plaintiff Mabry says inmates signed a petition complaining about the cold but they were placed on 24 hour lock down in their cells. The plaintiff further states that he was placed in segregation for 2 ½ days because he would not apologize for signing the petition. The plaintiff says Defendant Morris told the plaintiff that he "was not going to incite a riot today." (Def. Memo, Mabry Depo, p. 44)

Plaintiff Mabry says he was placed in segregation on one other occasion for one day. Mabry says he was yelling out his chuckhole talking to an officer when he saw Defendant Morris walking by with what appeared to be government officials or people who come to do inspections. The plaintiff says he started to talk to Defendant Morris through the chuckhole, but the defendant told officers to take him to segregation because he was being a "wise ass." (Def. Memo, Mabry Depo, p. 47)

Plaintiff Mabry says he did not have a problem with the prison's procedure for washing uniforms. (Def. Memo, Mabry Depo, p. 50-51) The plaintiff does dispute that inmates received over 2,000 calories a day in their three provided meals. However, he is not claiming he was injured as a result. (Def. Memo, Mabry Depo, p. 53)

Plaintiff Mabry says he was denied access to newspapers in the Knox County Jail. Defendant Morris told him that he did not want inmates to have newspapers because they would clog the toilets and flood cells.

Plaintiff Mabry says on July 8, 2004, he was handcuffed to another inmate named Darnell Cliff on his way back from the courthouse. The plaintiff claims that Cliff had a history of mental

illness and assaulting other inmates in the jail.  When they returned to the jail, they were brought to the booking area and the handcuffs were removed.  As officers began to take Plaintiff Mabry back to his pod area, Inmate Cliff struck the plaintiff in the back of the head, right ear and jaw area.  Inmate Cliff did not say anything before he hit Mabry and the inmate was immediately grabbed by the two officers who were present.  Plaintiff Mabry's ear was bleeding and he was taken to and outside hospital were he was given several tests and his ear was cleaned out.

On July 23 and 24, 2004 and September 2, 2004, Plaintiff Mabry submitted medical request forms saying he was suffering from headaches and ear pain.  He was seen and treated by a nurse on the first occasion and by a doctor on the second and third occasion.  The plaintiff was examined and received Tylenol or Motrin for his pain.

During his criminal trial on September 29, 2004, the plaintiff was taken from the courthouse to the hospital because he was having chest pains.  The plaintiff was diagnosed with elevated liver enzymes and says he was told by the doctor that due to his previous drinking, he may have developed cirrhosis of the liver.

The plaintiff was seen by a nurse on October 5, 2004 after he complained of pain in the chest area.  He was again seen by the nurse on October 11, 2004 after he complained that he was not getting his medication.  The nurse approved Ibuprofen for the plaintiff.  The plaintiff filled out a medical request form on November 8, 2004 regarding a problem with his tooth and was seen by a doctor.  The plaintiff asked for medical care again on November 19, 2004 concerning chest, shoulder and abdominal pain and was seen by a nurse on two occasions.  On November 30, 2004, the plaintiff requested to see a psychiatrist or crisis intervention person.  Defendant Morris told him that a visit with a psychiatrist must be ordered by the court and the plaintiff could speak with a religious advisor.

The plaintiff saw a doctor at an outside hospital in December of 2004 for treatment for his acid reflux and elevated liver enzymes.  He was provided further medical treatment by the doctor at the jail on two occasions in January of 2005.

PLAINTIFF WOODS.

Plaintiff Woods was an inmate at the Knox County Jail from November 28, 2003 to December 16, 2004.  Plaintiff Woods says he was denied access to legal materials at the Knox County Jail.  In his deposition, the plaintiff says he needed materials to prepare for an extradition hearing as well as other legal research issues in Texas, but all the jail provided was the Illinois Criminal Code. The plaintiff says he asked Defendant Morris if they could somehow set up the computer to allow access to Westlaw or some other legal research, but he never got a response.

Woods was represented by an attorney in his criminal trial in Illinois and says family members brought him legal research materials to assist in the preparation of his civil case and his efforts to contest extradition.

As for the jail conditions, Plaintiff Woods says his only complaint about the food served was the quantity of the food. Plaintiff Woods also says when the jail would wash uniforms, he was forced to wait without clothes for 3 to 5 hours and had to wear a blanket. The plaintiff says he is not aware of any physical injury or harm he suffered as a result of the inadequate heating or wearing sheets or blankets while clothes were washed.

The plaintiff says Defendant Morris told him the prohibition on media publications at the jail was to prevent inmates from clogging the toilets with newspapers. The plaintiff also complains that the only time for visits from the media was during regular visiting hours so he would have to chose between visits with the media or his family.

Plaintiff Woods says he was placed in segregation in December of 2003 for approximately 4 or 5 hours. Woods says he was moved after he complained that his new cell did not have a mattress. When he returned to his cell, he was allowed to get a mattress.

Woods was again placed in segregation in January of 2004 after he was involved in an altercation with another inmate. The plaintiff says he defended himself by grabbing the other inmate and holding him in a headlock. Woods was in segregation for two or three days. The plaintiff says he was involved in another incident with different inmate on May 2, 2004, but this time he was placed on lock down for 24 hours after the event.

The plaintiff's was again in segregation was in June of 2004. Woods and another inmate got into a fight over the television and Woods hit the other inmate. He was placed in segregation for three or four days.

The plaintiff says he wrote three articles that were published in the Zephyr Newspaper regarding conditions at the jail. The plaintiff says his first article was published on September 2, 2004. The plaintiff says he saw an officer pointing at the article and a few hours later he was in segregation. The plaintiff says he was in a close supervision cell at the time because the jail administration thought he was potentially suicidal after they intercepted a letter the plaintiff had written to a friend. The plaintiff says in was in segregation for about three weeks in September of 2004. During the time the plaintiff was in segregation, he attended a court proceeding and his attorney asked for Woods to be seen by a psychiatrist.

The plaintiff sent a request form on September 8, 2004 asking what his status was at the jail. Defendant Morris replied that he was in "medical protective custody-potentially suicidal." (Def. Memo, Woods Depo, p. 57). On September 21, 2004, the plaintiff requested to go back into the general population, but the very next day sent another request form asking that his initial request be disregarded. Woods stated that he was going through some emotional and psychological issues at the time and decided he would prefer the peace and solitude of segregation. The plaintiff says its possible that Defendant Morris tried to move the plaintiff back to the general population during this time frame, but the plaintiff refused. On September 22, 2004, the plaintiff again changed his mind and asked to be in the general population. His request was approved the next day.

7

The plaintiff's last stay in segregation was in December of 2004 after an altercation with another inmate.

PLAINTIFF HOLLOWAY

Plaintiff Holloway was in inmate at the Knox County Jail from September 29, 2004 to February 13, 2005.

Holloway says two or three times a week inmates had to stand with sheets around them while their uniforms were washed.   Plaintiff Halloway says inmate were not forced to stand in the nude.  He also says he received three meals a day and had money from his family so he could buy extra items at the store.  The plaintiff says his only complaints about the food served was the amount of food served.

Plaintiff Holloway was facing federal charges and asked Defendant Morris for a copy of the federal sentencing guidelines and Federal Criminal Code.  The plaintiff says he was told he needed to get these items from his attorney.  The plaintiff says he was able to get a portion fo the materials from his attorney and other inmates also supplied him with portions of the Federal Criminal Code.

Halloway requested magazines and newspapers while at the jail, but was told by Defendant Morris that inmates would use these items to clog he toilets.  Halloway says he did have access to hygiene items in the jail.

Holloway submitted a medical request form on October 23, 2004, complaining of a broken tooth. He saw a nurse the next day and was given Tylenol.  The plaintiff submitted a medical request two days later concerning a rash and bumps on his next.  The plaintiff was seen by a nurse the next day who provided treatment for the plaintiff.   The plaintiff saw the nurse again for this condition on December 6, 2004 and was again given cream for the area.  A doctor examined the plaintiff on December 15, 2004 and prescribed an antibiotic for swelling.

Holloway submitted a medical request on December 20, 2004 complaining about a broken tooth, a torn Achilles tendon, a bowel problem and a problem with his left heel.  The plaintiff saw the nurse that day and saw a doctor on December 27, 2004.

On January 3, 2005, the plaintiff complained about his broken tooth and that he was passing blood when he defecated.  He asked to see an outside doctor.  He was seen by a nurse that day and treated by doctor on January 5, 2005.

On February 4, 2005, the plaintiff was taken to a dentist to have his tooth removed. Holloway was given Tylenol and other pain medication.

PLAINTIFF BLAKE KALLENBACH

8

Plaintiff Blake Kallenbach was in the Knox County jail for approximately 30 days in August of 2004 and then again from September 29, 2004 to April 1, 2005.

Plaintiff Kallenbach says whenever he would ask to see Chapter 38 of the Illinois statutes, he was told that the book had already been loaned out or was unavailable.  Kallenbach says he did have a public defender who represented him on his criminal charges.

In his deposition, Kallenbach says he believes he was placed in segregation in August of 2004 in retaliation for filing a grievance, but says he has no evidence to support that claim. Kallenbach was also placed in segregation on November 26, 2004 and February 18, 2005.  He claims on one occasion there was blood and urine of the floor that was not cleaned up until 24 hours later.  On another occasion there was blood on the walls and floor and he was given cleaning supplies to clean his cell.

### III.  LEGAL STANDARD

The entry of summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56c.   A "material fact" is one that "might affect the outcome of the suit."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A dispute is genuine only if a reasonable jury could find for the nonmoving party.  *Id.*

A party moving for summary judgment initially has the burden of showing the absence of any genuine dispute of material fact based on the evidence.  *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 153 (1970);  *Schroeder v. Barth, Inc.,* 969 F.2d 421, 423 (7th Cir. 1992).  A nonmoving party cannot rest on its pleadings, but must demonstrate that there is admissible evidence that will support its position. *Tolle v. Carroll Touch, Inc.,* 23 F.3d 174, 178 (7th Cir. 1994).  The evidence and all reasonable inferences drawn therefrom are viewed in the light most favorable to the non-moving party. *Anderson,* 477 U.S. at 255.  Nonetheless, "(s)ummary judgement is not a discretionary remedy.  If the plaintiff lacks enough evidence, summary judgement must be granted." *Jones v. Johnson,* 26 F.3d 727, 728 (7th Cir. 1994).

### IV. ANALYSIS

**Claim #1: Defendants Morris, Thompson and Knox County were deliberately indifferent to the serious medical needs of Plaintiffs Holloway, Mabry, Judy and Kallenbach.**

The defendants claim that the plaintiffs cannot demonstrate that the defendants were deliberately indifferent to the plaintiffs' serious medical conditions.  Because the plaintiffs were pretrial detainees, their §1983 claims are analyzed under the Fourteenth Amendment's Due Process Clause rather than under the Eighth Amendment. *Butera v. Cottey,* 285 F.3d 6901, 605 (7th Cir. 2002).  Nonetheless, the claim is still "analyzed under the Eighth Amendment test." *Henderson v. Sheahan,* 196 F.3d 839, 844 n.2 (7th Cir. 1999).

The plaintiff must pass both an objective and a subjective test in order to establish that the defendants violated the Eighth Amendment. *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981); *Wilson v. Seiter*, 501 U.S. 294, 297 (1991).  The first prong of the test requires the plaintiff to demonstrate that the alleged deprivation was sufficiently serious. *Id.*  The Seventh Circuit has acknowledge that a "serious medical need" is far from "self-defining." *Gutierrez v Peters,* 11 F3d 1364, 1370 (7th Cir. 1997).  However, the court noted that the Supreme Court clearly intended to include not only conditions that are life-threatening, but also those in which denial or delay in medical care results in needless pain and suffering. *Id.*   On the other hand, "to say that the Eighth Amendment requires prison doctors to keep an inmate pain-free in the aftermath of proper medical treatment would be absurd." *Snipes v Detella,* 95 F. 3d 586, 592 (7th Cir. 1996).

The second prong of the Eighth Amendment test requires the plaintiff to show that the defendants acted with deliberate indifference.  *Farmer v. Brennan*, 511 U.S. 825, 828 (1994).  "[A] finding of deliberate indifference requires evidence that the official was aware of the risk and consciously disregarded it nonetheless." *Mathis v. Fairman*, 120 F.3d 88, 91 (7th Cir. 1997)(citing *Farmer* at 840-42)  Inadequate medical treatment due to negligence or even gross negligence does not support an Eighth Amendment violation. *Shockley v Jones*, 823 F.3d 1068, 1072 (7th Cir. 1987).  In addition, inmates are not entitled to a specific type of treatment, or even the best care, only reasonable measures to prevent a substantial risk of serious harm. *Forbes v. Edgar,* 112 F.3d, 262, 267 (7th Cir. 1997).  Deliberate indifference is "something approaching a total unconcern for [the plaintiffs'] welfare in the face of serious risks, or a conscious, culpable refusal to prevent harm." *Duane v Lane,* 959 F.2d 673, 677 (7th Cir. 1992).

"[P]roof of deliberate indifference may be found where a prison official intentionally denies or delays access to medical care or intentionally interferes with the treatment once prescribed." *Jones v. Natesha* ,151 F.Supp.2d 938, 945 (N.D. Ill.  2001) *citing Ford,* 2001 WL 456427 at 6.   However, "an inmate who complains that delay in medical treatment rose to constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." *Langston v Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996).  Delays that cause "needless hours of suffering" can constitute harm. *Gil v. Reed,* 381 F. 3d 649, 662 (7th Cir. 2004).

PLAINTIFF JUDY:

Plaintiff Judy maintains the defendants were deliberately indifferent to his serious medical condition because he waited nine days to first see a doctor for the "oozing ulcer" on his left foot, he had an allergic reaction to the first antibiotic he was given and "[f]rom the initial complaint in January 12, 2004 to the date that a final test and determination of Judy's condition was completed was a total of over four months."(Plain. Resp, p. 5).

The plaintiff admits he had ulcers on his feet before he entered the Knox County Jail and a podiatrist had been treating him.  The plaintiff did in fact receive care the day after he first put in a medical request.  A nurse examined and treated the plaintiff's foot on January 13, 2004 and

again on January 19, 2004.  In fact, between the time the plaintiff first complained about his left foot and the time he was diagnosed with a staph infection, the plaintiff was seen and treated by the nurse on 8 occasions and by Dr. Johnson on 6 occasions. (Def Memo, Undisputed Facts # 7-29.)

In addition, the plaintiff admits that throughout the four month time period, his foot did improve.  In fact, his foot condition would show signs of improvement, and then begin to hurt again. (Def. Memo, Undisputed Facts # 15, 16, 19, 24, 26).  The doctor noted that the plaintiff's foot was not infected on January 19, 2004 and at times, it appeared the plaintiff's foot had almost healed. (Def. Memo, Ex B., p. 1; Ex A, p. 35, Ex. B, p. 5)   There is also no evidence before this court that the plaintiff had a staph infection for four months.

Even after the plaintiff was treated for the staph infection, he continued to receive treatment for a variety of ailments.  From January 12, 2004 to February 14, 2005, the plaintiff was treated by medical staff on approximately 28 occasions.  On January 7, 2005, Dr. Johnson noted that the plaintiff was no longer reporting any problems with his feet and no abnormalities were noted. (Def. Memo, Ex. A, p. 54; Ex. B, p. 12).  The plaintiff has failed to present evidence that the defendants were deliberately indifferent to his foot condition.

As for the plaintiff's allergic reaction to the first antibiotic he was given on January 21, 2004, there is no evidence of deliberate indifference.  There is no indication that Dr. Johnson knew the plaintiff would have an allergic reaction to this drug.  When the plaintiff began to show symptoms of an allergic reaction, he was immediately taken to an area hospital.

Plaintiff Judy also complains about the delay in the dental care he received.  The plaintiff says he first complained about tooth pain on April 18, 2004.   Defendant Morris scheduled the plaintiff for sick call where he was examined by a nurse.  The plaintiff submitted another medical request on June 3, 2004, and he was again scheduled to see a nurse.  Both Defendant Morris and the nurse said the plaintiff would have to be seen by the doctor to determine whether he would be sent to a dentist.  The plaintiff saw a dentist two and half months after his initial complaint on June 23, 2004 and his tooth was pulled.   The plaintiff maintains this was an unreasonable delay.  Plaintiff Judy says the jail is not equipt to handle inmate's dental problems since it does not have a dentist on staff.  In addition, the plaintiff says he should not have to see a doctor before he is approved for a dental visit.

The plaintiff did first complain of tooth pain on April 18, 2004, but again the medical record does not indicate he suffered with tooth pain for two and a half months.  The plaintiff's first medical request complained of tooth pain as well as foot pain.  The first medical note after his request is from Dr. Johnson on April 28, 2004 when he examined the plaintiff. (Def. Memo, Ex B) The plaintiff said he was doing well and he was advised to stay off his feet.   There is no mention of the plaintiff's tooth.  The plaintiff filled out another medical request on May 12, 2004 regarding his foot, but the plaintiff makes no mention of any tooth pain.  The plaintiff then received extensive treatment for his staff infection, but there was no mention of continued tooth pain.

The plaintiff's next complaint about tooth pain was on June 3, 2004.   The plaintiff complained of both tooth pain and spots on his scrotum.  He saw the nurse on June 7, 2004 for both complaints.   The plaintiff was referred to the doctor on June 9, 2004.  The plaintiff stated that he was doing well.  The doctor treated the plaintiff for spots on his scrotum, but there were no notes indicating that the plaintiff was suffering from tooth pain.  The plaintiff says he does not remember if he mentioned any tooth problems to the doctor on this visit. (Def. Memo, Ex A., p. 47).

The plaintiff filled out another medical request from concerning tooth pain on June 14, 2004 and was seen by a nurse the same day.  She noted no swelling and prescribed Tylenol for the pain.   The plaintiff was scheduled to see a dentist and this visit occurred on June 23, 2004. The dentist pulled the plaintiff's tooth and the plaintiff says that was the end of his tooth problems. (Def. Memo, Ex. A, p. 48).

There is no evidence before the court that the defendants were deliberately indifferent to the plaintiff's tooth problems.  While the plaintiff did first complain about a sore tooth on April 18, 2004, he also complained of multiple other health issues.   The tooth apparently was not the plaintiff's main concern as there are no indications he complained of tooth pain during repeated visits with the nurse and doctor.  The plaintiff does not claim that the records are inaccurate or that he did in fact complain of tooth pain on these visits.  The first real indication that the plaintiff again has tooth pain is on June 14, 2004.  The plaintiff is given medication for the pain and sees a dentist nine days later.  The plaintiff does not state that he suffered pain during this time frame.

The plaintiff's main complaint appears to be that he was not allowed to see a dentist when he first mentioned that his tooth was bothering him.   The plaintiff has failed to demonstrate a violation of his constitutional rights.

PLAINTIFF MABRY

Plaintiff Mabry says the defendants were deliberately indifferent to his serious medical needs on five occasions.  First, the plaintiff states that he was assaulted by another inmate on July 8, 2004 and taken to an outside hospital emergency room.  The medical staff prescribed ear drops for the plaintiff to use for seven days.   However, the plaintiff says as soon as he returned to the Knox County Jail, he was not allowed to have the ear drops.   The plaintiff says he submitted request forms to Defendant Morris who scheduled the plaintiff to see the nurse.  The nurse told the plaintiff that his prescription had expired and he would have to talk to Defendant Morris about a renewal.

The record before the court demonstrates the plaintiff was taken to an outside hospital on the day of the assault.  The plaintiff says the medical staff performed tests, cleaned out his ear and gave him ear drops to use for seven days. On July 23 and 24, 2004, the plaintiff filled out a medical request form stating that he was suffering from migraine headaches and not getting his medication.  The plaintiff was seen by a nurse and then the doctor and was prescribed medicine for his headaches.   The plaintiff says he made several requests for the eardrops.  When the nurse

found the drops, she told the plaintiff the prescription was for seven days and had expired.  The plaintiff submitted another medical request on September 2, 2004 stating that his ear was hurting. He saw a doctor six days later who prescribed Ibuprofen for the pain.  There are no further indications the plaintiff complained about his ear.

It is not clear, but it does not appear the ear drops were prescribed for pain relief and it does not appear the plaintiff asked for the drops until after the prescription had expired.  Although it is somewhat doubtful the plaintiff can demonstrate the defendants were deliberately indifferent, the record before the court leaves too many unanswered questions.   The only real evidence submitted to the court is the plaintiff's deposition and medical records without any interpretation from medical personnel.  Did Defendant Morris have any involvement in the plaintiff's treatment?  What exactly was the plaintiff's ear injury?   Was his eardrum damaged?  Were the drops prescribed for the plaintiff as he claims?  Did the drops have anything to do with pain relief?  Was any other medication prescribed at the hospital for pain relief?  Did the plaintiff ever receive the drops?  Did the plaintiff suffer any lasting injury?  Did the plaintiff make any requests for the drops during the seven days?   Without more details, the motion for summary judgement on this claim is denied.

Second, Plaintiff Mabry says he was taken to the hospital again on September 29, 2004, where he was diagnosed with elevated liver enzymes.  The plaintiff says he was scheduled for a follow up visit on September 30, 2004, but the defendants refused to transport him.  The plaintiff says he made numerous requests to have the appointment rescheduled, but Defendant Morris refused.  The plaintiff says he was not taken for a follow-up appointment until three months later on December 22, 2004.

Again, the evidence on this claim is not very well developed.  The plaintiff has submitted a medical record which states that the examining doctor at the hospital on the initial visit wanted the plaintiff back for an examination by Dr. Patel on October 1,  2004.   The defendants make no mention of this.  Instead, the defendants point to the fact that the plaintiff was allowed to see Dr. Patel regarding his elevated liver enzymes in December of 2004.  In the interim, the plaintiff was seen by medical personnel on five occasions: October 4, 2004; October 12, 2004, November 23, 2004, November 24, 2004; and December 11, 2004.   It also appears from the medical record that the follow up examination requested by Dr. Patel was scheduled one month later.

While there is no explanation why the first appointment was missed, there is no evidence to support the plaintiff's claim that the defendants were deliberately indifferent to his condition. He was repeatedly seen by medical personnel and he was allowed the follow up visit.  There is also no evidence that this delay had a detrimental effect on the plaintiff's condition. *Langston,* 100 F.3d at 1240.

Third, the plaintiff says he was denied dental care.  Plaintiff Mabry says he complained about tooth problems on November 8, 2004, but he was scheduled to see Dr. Johnson. "The systemic failure of Knox County Jail officials to make available a dentist to treat Plaintiff Mabry and others dental needs constitutes deliberate indifference." Plain. Resp. p. 9

13

The plaintiff has failed to demonstrate a violation of his constitutional rights.  The plaintiff complained of tooth pain and saw a doctor.  There is no evidence the plaintiff complained of further tooth pain or made any additional requests for a dentist or suffered any harm because he did not see a dentist.  *See Hartsfield v. Colburn,* 491 F.3d 394 (8th Cir. 2007) (nurse and doctor acted reasonably in requiring second sick call request from detainee before referring him to a dentist).

Fourth, Plaintiff Mabry says the jail refused to allow him any psychiatric care.  Mabry says when he asked for this care, Defendant Morris scheduled an appointment with Dr. Johnson.  The plaintiff claims Dr. Johnson told the plaintiff that he would need Defendant Morris' approval for psychiatric care.  Defendant Morris also told the plaintiff that he could request that the court approve a visit a psychiatrist.   The plaintiff did not make this request.

The plaintiff has failed to state a violation of his constitutional rights.  Psychiatric care is not a fundamental right. "Even persons who are suicidally depressed are entitled, at most, to precautions that will stop them from carrying through, they do not have a fundamental right to psychiatric care at public expense." *Lewis v Sullivan,* 279 F.3d 526, 529 (7th Cir. 2002).  The motion for summary judgement is granted on this claim.

Finally, the plaintiff says the defendants method of dispensing over-the-counter medications shows deliberate indifference to serious medical conditions.   The jail refuses to dispense any medication unless a prisoner is seen by medical staff.   The plaintiff says because of this policy, he went without pain medication from August 6, 2004 to September 9, 2004; from October 1, 2004 to October 12, 2004 and from October 29, 2004 to November 23, 2004.  The plaintiff offers no further explanation of this delay.  Did he request to see medical personnel during this time?   The plaintiff clearly argues that he should not have to make this request.

The plaintiff has provided no evidence that he was suffering from a serious medical condition on any of these occasions, nor has he provided any evidence that he was denied medication when he requested it through the jail procedures.  The jail procedures on their face do not violate the constitution.  The motion for summary judgement is granted on this claim.

PLAINTIFF HOLLOWAY

Plaintiff Holloway says the defendants were deliberately indifferent to his medical needs due to the excessive delay before he was allowed to see a doctor.  Plaintiff Holloway says he complained about a rash on his neck and tooth pain on October 23, 2004, but he was not seen by a doctor until two months later on December 15, 2004.  The plaintiff says he still suffered from tooth pain after this visit and complained to the defendants.  However, he was not allowed to see a dentist until February 4, 2005.

The plaintiff did submit a medical request on October 23, 2004 complaining of a broken tooth.  A nurse saw the plaintiff on the same day and she prescribed Tylenol.  The nurse noted there were no signs of infection.   The plaintiff submitted another medical request two days later

14

on October 25, 2004 complaining about bumps on his neck, but made no mention of tooth pain. He was seen by a nurse the next day, diagnosed and given hydrocortisone cream.  The plaintiff submitted a medical request on November 2, 2004 complaining about the skin on his feet and was again treated by a nurse.  There is no mention of tooth pain.

The plaintiff submitted a medical request on December 6, 2004 stating he had a rash on his neck.  He was seen by a nurse that day who scheduled the plaintiff to see the doctor on December 15, 2004.   The doctor prescribed an antibiotic.  The plaintiff submitted a medical request form on December 20, 2004 complaining of a variety of ailments including a broken tooth.  He was seen by a nurse that day and by the doctor on December 27, 2004.

On January 3, 2005 the plaintiff submitted two requests complaining about his tooth and other issues.  He asked to see a dentist.  The plaintiff was seen by the nurse on the same day and by the doctor on January 5, 2005.   The plaintiff was scheduled for a dental appointment on February 4, 2005.  The plaintiff's tooth was pulled at that time.

The plaintiff's claim that he did not receive medical treatment for long periods of time is simply not correct.  The medical records show the plaintiff was repeatedly seen and treated by a nurse every time he filled out a medical request form.    The plaintiff also was treated by a doctor during this time period.  In fact, the plaintiff was treated by medical personnel 9 times in a 4 month period.  There is no evidence the rash the plaintiff suffered from was a serious medical condition or that there was any delay in treatment for the rash.

The record presented to the court notes that the plaintiff did complain about a broken tooth, but the plaintiff has not pointed the court to any document showing the plaintiff complained of pain until shortly before he saw the dentist.  Even if the plaintiff had complained of pain when he first reported his broken tooth in October, he did not mention it again until December even though he saw medical staff during this time period.  There is no evidence the plaintiff was in great pain, was unable to eat or suffered any permanent damage during this time. The plaintiff has failed to show that the defendants were deliberately indifferent to his medical conditions.   The motion for summary judgement on this claim is granted.

PLAINTIFF KALLENBACH

Plaintiff Kallenbach says the defendants were deliberately indifferent to his serious medical needs because the procedures at the jail to obtain medical care lead to extended delays or no care at all.  The plaintiff says he had broken his shoulder not long before he was arrested. While in jail, he asked to see a doctor, but was only allowed to see a nurse.  The plaintiff says he made numerous requests, but never did see a doctor during his one month stay in the jail. Plaintiff Kallenbach says Defendant Morris, who is not a licensed medical practitioner, must approve all requests for medical care

While the plaintiff may not like the policies at the Knox County Jail and may have wanted to see a doctor, he has failed to demonstrate a violation of his constitutional rights.  The records

15

before the court demonstrates the plaintiff did ask to see a doctor concerning his shoulder and instead was allowed to see the nurse. There is no evidence the care he received was inadequate, that he was in pain or there was any harm to the plaintiff because he did not see a doctor during the 30 day period.

The fact that the plaintiffs would prefer to see a doctor rather than a nurse is not a violation of the constitution. The fact that the plaintiffs do not believe they should see a nurse or doctor before seeing a dentist is not a violation of the constitution. The plaintiffs have failed to show that any delay in seeing a doctor or dentist resulted in any detrimental effect or harm. The plaintiffs claims that they suffered with tooth pain for months before receiving treatment is not corroborated by their own medical request forms. Any delays in treating the plaintiffs, even if negligent, are not the type of deliberate indifferent which the Eighth Amendment prohibits. *See Martin v Tyson,*- 845 F.2d 1451, 1458 (7th Cir. 1988). The motion for summary judgement is granted as to all medical claims except Plaintiff Mabry's allegation that he was denied prescribed medication for his injured ear.

**Claim #2: Defendants Morris, Thompson and Knox County did not provide adequate heat, clothing,  food or grooming for the plaintiffs.**

The defendants argue that the plaintiffs have failed to show that Defendants Morris, Thompson and Knox County violated their constitutional rights when then did not provide adequate heating, clothing, food or grooming for the plaintiffs. The defendants argue the conditions complained about were temporary conditions that did not rise to the level of a constitutional violation.

The plaintiffs must pass both an objective and a subjective test in order to establish that the conditions of their confinement violated the constitution. *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981); *Wilson v. Seiter*, 501 U.S. 294, 297 (1991). The plaintiffs must first demonstrate that the alleged deprivations were "sufficiently serious." *Wilson*, 501 U.S. 298. Only conditions involving the denial of  the "minimal civilized measure of life's necessities" rise to the level of a constitutional violation. *Rhodes*, 452 U.S. at 347. The plaintiff must also show that the defendants acted with deliberate indifference.   *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). "[A] finding of deliberate indifference requires evidence that the official was aware of the risk and consciously disregarded it nonetheless." *Mathis v. Fairman*, 120 F.3d 88, 91 (7th Cir. 1997)(citing *Farmer* at 840-42).

"The Supreme Court has emphasized that 'no static test' can exist by which courts determine whether conditions of confinement are cruel and unusual." *DeMallory v. Cullen,* 855 F.2d 442, 445 (7th Cir. 1988) *citations omitted.*  "In all cases, the determination as to whether prison conditions constitute cruel and unusual punishment turns on the totality of the circumstances." *Id.*

The plaintiffs first claim that the "quantity of food served them while at the Knox County jail was grossly deficient." (Plain. Resp. P. 13). The primary cause of the "daily deficiency in

nutrients" was a breakfast that consisted of a small half bowl of cereal.  *Id.*

Defendant Morris, the jail administrator, states that jail standards require inmates to receive 2,000 calories of food per day, and inmates at the Knox County Jail receive approximately 2, 900 calories a day. (Def. Memo, Morris Aff, p. 2)  The plaintiff's point out that Defendant Morris does not state the basis for this claim, nor have the defendants provided any information from the person in charge of preparing the inmate meals.  Nonetheless, the plaintiffs have also provided no evidence to dispute this claim.

There is simply no evidence before this court that the quantity of food served at the jail rose to the level of a constitutional violation.  Detention facilities are required to prepare "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *French v. Owens*, 777 F.2d 1250, 1255(7th Cir. 1985), quoting *Ramos v. Lamm*, 639 F.2d 559, 570-1 (10th Cir. 1981).  There is no evidence that the quantity of food served at the jail presented any danger to the health or well being of the plaintiffs.  *See also Green v Ferrell,* 801 F.2d 765, 770-71 (5th Cir. 1986) (finding two meals a day sufficient if nutritionally and calorically adequate.);*Cunningham v. Jones,* 667 F.2d 565, 566 (6th Cir. 1982) (finding one meal a day for 15 days, where meal contained 2,000-5,000 calories was sufficient to maintain health).

The plaintiffs second contention is that temperatures in the jail were often extremely cold.  The defendants have pointed out that Plaintiff Mabry stated that in December of 2004 the jail was cold because the heating system was not working and he was forced to sit around in a blanket.  However, Mabry also admits the system was repaired within three to five days and the temperatures returned to normal.  The plaintiff's maintain there were other occasions they complained about cold temperatures and no action was taken.  The plaintiffs point to complaints made by Plaintiff Woods on January 28, 2004 and October 2 and 6, 2004.  However, Plaintiff Woods also sent a note to Defendant Morris on October 6, 2004 complimenting him on his fast response to complaints about the temperatures. (Plain Resp., Ex. X)

Defendant Morris concedes that when the new jail opened in 2001, they did experience some problems with the heating and air conditions system on some occasions.  Morris maintains whenever a problem was discovered, it was "fixed immediately." (Def. Memo, Morris Aff, p. 3)

Once again, the plaintiff's complaint does not rise to the level of a constitutional violation.  It's questionable the plaintiffs were exposed to extreme cold temperatures that posed an excessive risk of harm.  There is no evidence the plaintiffs suffered any health problems as a result of the temperatures. The plaintiffs were not denied blankets or bedding while the heating system was fixed.   There is no evidence the defendants knew there was an excessive risk of harm to the plaintiffs and no evidence the defendants were deliberately indifferent to that harm.

The plaintiff's third allegation is they were not provided adequate clothing in the Knox County Jail.  The plaintiff's main complaint is they were not given any replacement uniforms to wear while their jail uniforms were laundered.

Defendant Morris says inmates were not forced to stand naked while they waited for new uniforms.  "Inmates were allowed to wear their underwear and T-shirts." (Def. Memo, Morris Aff, p. 1)  Morris further states inmates were required to go without uniforms during this time period because the jail did not have surplus uniforms for them to wear.

While failing to have enough replacement uniforms is not commendable, there is no evidence that the practice rose to the level of a constitutional violation.  A plaintiff must allege more than a mere discomfort or inconvenience as a result of confinement. *Caldwell v Miller,* 790 F.2d 589, 601 (7th Cir. 1986).

The plaintiffs present no arguments concerning a denial of hygiene items.  The motion for summary judgement as to the plaintiffs' claim that defendants failed to provide adequate heat, clothing, food or grooming is granted.

**Claim #3: Defendants Morris, Thompson and Knox County failed to protect Plaintiff Mabry on July 8, 2004, when the plaintiff was handcuffed to another inmate with a history of assaults and mental illness.**

The defendants argue that Plaintiff Mabry's claim must fail because there is no evidence that the defendants knew of a specific threat of harm to this plaintiff**.**  As with the previous claims, the plaintiffs' §1983 claim is analyzed under the Fourteenth Amendment's Due Process Clause rather than under the Eighth Amendment. *Butera v. Cottey,* 285 F.3d 6901, 605 (7th Cir. 2002).  Nonetheless, the claim is still "analyzed under the Eighth Amendment test." *Henderson v. Sheahan,* 196 F.3d 839, 844 n.2 (7th Cir. 1999).

 "Because officials have taken away virtually all of a prisoner's ability to protect himself, the Constitution imposes on officials the duty to protect those in their charge from harm from other prisoners."  *Mayoral v. Sheahan*, 245 F.3d 934, 938 (7th Cir. 2001).  Failure to provide this protection violates the Eighth Amendment only if "deliberate indifference by prison officials [to the prisoner's welfare] effectively condoms the attack by allowing it to happen." *Haley v Gross*, 86 F. 3d 630, 640 (7th Cir. 1996).  "Thus, in order to establish the liability of a prison official, a plaintiff must establish that the official knew of the risk (or a high probability of the risk) and did nothing." *Pope v Shafer,* 86 f.3d 90, 92 (7th Cir. 1996).  "[A] negligent failure to protect an inmate from harm by fellow inmates is not actionable under the Eighth Amendment or directly under the Due Process Clause." *Lewis El v. O'Leary*, 631 F.Supp. 60, 62 (N.D.Ill.1986)

Plaintiff Mabry says the defendants handcuffed him to another inmate who was known to have a history of mental illness and had previously assaulted other inmates.   Mabry says he was handcuffed to Inmate Darnell Cliff while going to and from court on July 8, 2004.  When they returned to the booking area and the handcuffs were removed, Inmate Cliff struck Mabry in the back of the head.  The attack was without warning and the two officers in the booking area immediately grabbed Inmate Cliff.

Plaintiff Mabry says the defendants knew the inmate posed a risk because of his history of

18

mental health problems and because the inmate was segregated from other inmates due to this threat.  Mabry further states that Defendant Morris apologized to him and stated that the plaintiff should not have been handcuffed to Inmate Cliff.

The defendants argue that there is no evidence before the court that the Defendants were aware that Inmate Cliff had previously assaulted inmates.  Further, even if the defendants were aware of the assaults, the defendants state there is still no evidence that the defendants had reason to believe the plaintiff in danger on July 8, 2004 or that Inmate Cliff would attack the plaintiff.  In addition, the defendants were not deliberately indifferent because officers immediately subdued the inmate.

While the court does not believe the defendants knew that Inmate Cliff was going to attack the plaintiff at the exact moment he attacked the plaintiff, there are too many unanswered questions for the court to determine if the defendants knew there was a high probability that Inmate Cliff would attack any inmate, but still handcuffed him to the plaintiff.  For instance, did Inmate Cliff assault any other inmates while in the custody of the Knox County Jail?  If so, how often and when?  Did Inmate Cliff have a history of mental health problems?  Was he diagnosed with any mental disorder while in the Knox County Jail?   Was Inmate Cliff segregated from other inmates due to a perceived threat to other inmates?  The motion for summary judgement on this claim is denied.

**Claim #4:  Defendants Morris, Thompson and Knox County violated Plaintiffs Woods and Kallenbach's due process rights when they were placed in punitive segregation without any notice of the charge or formal hearing.[1]**

Plaintiffs Woods and Kallenbach claim they were repeatedly placed in segregation for no legitimate reason.  The Due Process Clause of the Fourteenth Amendment requires that a pretrial detainee cannot be placed in detention or segregation for a disciplinary infraction without notice and an opportunity to he heard. *Rapier v. Harris*, 172 F.3d 999, 1004-5 (7th Cir. 1999).  However, "no process is required if he is placed in segregation not as punishment but for managerial reasons." *Higgs v. Carver,* 286 F.3d 437, 438 (7th Cir. 2002).  For instance, a pretrial detainee could be placed in segregation without a hearing if he was considered a suicide risk .*Myers v. County of Lake*, 30 F.3d 847, 850 (7th Cir. 1994).  The same is true if the inmate was placed in segregation to protect himself from other prisoners or to protect jail staff from inmates with violent tendencies. *Higgs,* 286 F.3d at 438.  "As long as the purpose was indeed a preventive rather than a punitive one, he would not be entitled to notice and a hearing.  Indeed, a jail's failure

---

[1]The court notes that the plaintiffs also make reference to the defendants depriving Plaintiff Mabry of his due process rights.  However, this was not identified as a claim in the November 18, 2005 merit review order and plaintiffs did not ask for Plaintiff Mabry to be added to this claim after the entry of the merit review order. *See* November 18, 2005 Merit Review Order.  Therefore, the a claim that the defendants violated Plaintiff Mabry's due process rights is not before this court.

to take steps to prevent harm to the prisoner or to other prisoners might give rise to meritorious suits against the jail." *Id.*

In addition, when determining whether a measure is punitive or managerial, the Supreme Court has admonished courts to remember that the implementation of such measures is

> peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgement in such matters. *Bell v. Wolfish* 441 U.S. 520, 540 n. 23 (1979)(quoting *Pell v Procunier*, 417 U.S. 817 (1974)).

The defendants claim the plaintiffs were placed in segregation because they were either a threat to others or were a suicide risk.   The plaintiffs claim they were placed in segregation after they wrote grievances or contacted the media about jail conditions or refused to write letters of apology.

Neither side has presented the court with a clear chronology of events.  The only exhibits referenced by the defendants are the plaintiff's own depositions.  This is not sufficient.  The plaintiffs claim they are unclear on the dates they were in segregation.  They also claim they were placed in segregation right after they filed a grievance or complained to the media about jail conditions. There is no evidence from a defendant stating the reasons for their actions.  No defendant states when the two plaintiffs were in segregation or why they were in segregation. There are also no documents from the defendants showing when the plaintiffs were in segregation or why they were there.

The parties will be required to provide more detailed information concerning the events. What time periods were Plaintiffs Woods and Kallenbach in segregation?  Is there any documentation to confirm this?  Is there any documentation to confirm the defendants' claims as to why the plaintiffs were placed in segregation?  What grievances did the plaintiff's file before they were placed in segregation?  Do the plaintiff's have copies of the grievances or newspaper articles?   The parties should answer these specific questions and point the court to the specific documents that address these issues.  The motion for summary judgement on this claim is denied.

**Claim #5:  Defendant Morris and Knox County retaliated against Plaintiffs Mabry, Kallenbach and Woods for either filing grievances or speaking to the media about jail conditions.**

Although it is easy to state a retaliation claim, the burden of proving the claim is heavy. *Babcock v. White*, 102 F.3d 267, 275 (7th Cir. 1996); *see also Cole v Litscher*, 2005 WL 627791 (W.D. Wis. March 15, 2005).  A prisoner must prove that his constitutionally protected conduct was a substantial or motivating factor in a defendant's actions. *Spiegla v. Hull*, 371 F.3d 928, 942-43 (7th Cir. 2004).  Once the plaintiff proves that an improper purpose was a motivating factor, the burden shifts to the defendant to prove by a preponderance of the evidence that the

same actions would have occurred in the absence of the protected conduct. *Id.* at 943.  Therefore, if a prison officer's actions are supported by legitimate penological concerns, the retaliation claim fails as a matter of law.

Once again, because no clear chronology of events has been presented to the court, the court cannot properly address this claim.  The defendants have also failed to clearly state on each occasion why they placed the defendants in segregation.

**Claim # 6: Defendants Morris, Thompson and Knox County denied the plaintiffs meaningful access to the courts when they were denied all writing material and access to legal materials.**

The defendants argue that the plaintiffs have failed to establish that they were denied access to the courts.  It is well established that prisoners have a constitutional right under the First Amendment to meaningful access to the courts. *Lewis v Casey,* 518 U.S. 343 (1996); *Bounds v. Smith,* 430 U.S. 817 (1977). The relevant inquiry is whether an inmate has been given a "reasonably adequate opportunity" to present his claims.  *Bounds*, 430 U.S. at 1496.  Courts use a two-prong test to make this determination.

First, prison authorities are required "to assist inmates in the preparation and filing of meaningful legal papers." *Alston v. DeBruyn,* 13 F.3d 1036, 1041 (7th cir. 1994). They may satisfy this duty by either providing inmates with access to an adequate law library or adequate assistance from "trained legal personnel." *Id.*  "As a general rule, the appointment of counsel is sufficient to discharge the state's obligation to provide an inmate with meaningful access to the courts." *Partee v. Cook County Sheriff's Office,* 863 F.Supp. 778, 781 (N.D. Ill.  1994). "[N]o constitutional right exists mandating that the prisoner in the alternative be provided access to a law library should he refuse the services of court-appointed counsel." *United States ex. rel. George v. Lane,* 718 F.2d 226, 233 (7th Cir. 1983); *see also Partee,* 863 F.Supp. at 781. (rejection of public defender was plaintiff's choice and did not "enhance in any way his right of access to research or other legal materials.")

Second, a plaintiff claiming he was denied this help must also show that the failure "hindered [the plaintiff's] efforts to pursue a legal claim."  *Lewis,* 518 U.S. at 351.  The plaintiff must show "some quantum of detriment caused by the challenged conduct." *Jenkins v Lane,* 977 F.2d 266, 268 (7th Cir. 1992).  Simply alleging that the defendants caused a delay in ligation is not enough.  "Regardless of the length of an alleged delay, a prisoner must show actual substantial prejudice to specific litigation.  If a mere allegation of some delay, even to contemplated litigation, were adequate, the second part of test would have no real import." *Gentry v. Duckworth,* 65 F.3d 555, 559 (7th Cir. 1995).

The defendants state the plaintiffs have presented no evidence that they were prejudiced in either civil or criminal litigation.   In criminal litigation, the defendants point out that all of the plaintiffs except Mabry were represented by counsel.  Plaintiff Mabry admits he chose to represent himself, but says he was denied access to a law library.  Plaintiff Mabry says he finally

spoke to the judge in his criminal trial and the judge ordered the Knox County Sheriff to take the plaintiff to the county law library.  The plaintiff says he still had to wait weeks before he was allowed two visits and the defendants refused to unshackle his hands which made it impossible for him to reach law books.  The plaintiff was still allowed an attorney which he refused, was taken to the law library and has not shown a substantial prejudice.

The plaintiff's also present no compelling evidence that they were prejudiced in any civil action.  Plaintiff Woods does state that it hindered his efforts to fight extradition and he was forced to file an amended complaint two times in the Northern District of Texas.  The plaintiff says he believes this would not have been necessary if he had been provided the appropriate legal materials.  Nonetheless, this slight delay does not demonstrate the kind of substantial prejudice that rises to a constitutional violation.

The plaintiffs further claim the lack of adequate legal materials hindered their efforts to file a lawsuit concerning the conditions at the jail.  However, the fact that plaintiffs were able to bring this lawsuit challenging jail conditions suggests that they were not constitutionally harmed. *see Martin v. Tyson,* 845 F.2d 1451, 1456 (7th Cir. 1988); *see also Howland v Kilquist,* 833 F.2d 639, 642 (7th Cir.  1987).  The motion for summary judgement on this claim is granted.

**Claim # 7: Defendants Morris, Thompson and Knox County violated the First Amendment when they denied the plaintiffs access to all newspapers and media publications without any rational basis.**

The defendants argue that they are entitled to summary judgement on the plaintiffs' First Amendment claim.  Although prisoners retain their constitutional rights while incarcerated, those rights may be limited by the fact of confinement and the needs of the penal institution.  *Bell v. Wolfish*, 441 U.S. 520, 545 (1979).   "A prison regulation [that] impinges on inmates' constitutional rights...is valid if it is reasonably related to legitimate penological interests." *Turner v Safley*, 48 U.S. 78, 89 (1987).  In addition, the court notes that it is "required to give considerable deference to prison officials.  Because the judiciary is 'ill equipped' to deal with the 'inordinately difficult undertaking' that is prison management, a court may not substitute its judgement for that of prison officials who regulate the relations between prisoners and the outside world." *Lindell v. McCaughtry*, 2003 WL 23218012 (W.D. Wis.  Oct. 7, 2003) citing *Thornburgh v Abbott*, 490 U.S. 401 (1989).

The Supreme Court has set forth factors for courts to consider when testing the reasonableness of a regulation.  *Turner v. Safely*, 482 U.S. 78, 89-90 (1987).  The factors include: (1) whether a valid, rational connection exists between the regulation and a legitimate government interest; (2) whether there are other means of exercising the right in question for prisoners; (3) the impact accommodating the claimed right would have on guards, other inmates and prison resources; and (4) the availability of obvious and easy alternatives to the regulation. *Id.*

Defendant Morris says that all magazines and newspapers were prohibited in the jail because inmates were using the material to flood cells by placing the paper in toilets.  The

plaintiffs claim there is no evidence prisoners ever used newspapers or publications to flood cells. Morris admits the restriction was lifted in April of 2005, but does not state why. The defendants point out that the burden "is not on the State to prove the validity of prison regulations but on the prisoner to disprove it." *Overton v. Bazzetta*, 532 U.S. 126, 132 (2003).

While some relevant information has not been presented by either side, this case appears similar to *Mann v. Smith,* 796 F.2d 79 (5th Cir. 1986). In the *Mann* case, a county jail prohibited all pretrial detainees from receiving newspapers or magazines in an effort to reduce the threat of fires and clogged toilets. However, there was no evidence that other forms of paper or books were also banned. "The patently under inclusive nature of the regulation strongly suggests that it is indeed an exaggerated response by jail officials to the legitimate need to preserve internal order and discipline and to maintain institutional security."*Id.* at 82, *quoting Bell v. Wolfish*, 411 U.S. 520, 547-48 (1979)**.** *See also Green v. Ferrell,* 801 F.2d 765 (5th Cir. 1986). The motion for summary judgement on this claim is denied.

The plaintiffs also claim they were denied access to talk to the media while in the jail. Inmates could talk to the media during visitation hours, but there was no procedure for privileged visits from the media. Therefore, inmates would have to give up visitation time with family members in order to talk to the media.

This is clearly not a violation of the plaintiffs' constitutional rights. While inmates' free-speech rights include access to the media, inmates do not have a right to face-to-face interviews so long as other avenues of communication are open to them, and regulations denying face-to-face interviews are applied in a neutral, equal manner without regard to content. See *Pell v. Procunier*, 417 U.S. 817, 827-28 (1974). The motion for summary judgement on the claim involving media interviews is granted.

**Claim # 8: All defendants violated the plaintiffs right to counsel by recording conversations between the plaintiffs and their counsel and making the tapes available to jail officials. The plaintiffs allege the practice interfered with their ability to communicate with counsel.**

The defendants argue that the plaintiffs have failed to demonstrate that the recording of outgoing conversations interfered with the plaintiff's right to counsel. Pre-trial "detainees cannot enjoy the full range of freedoms of unincarcerated persons." *Jackson v. Elrod,* 881 F.2d 441, 222 (7th Cir. 1989). The defendants may tape the plaintiffs telephone conversations with an attorney "only if such taping does not substantially affect the prisoner's right to confer with counsel." *Tucker v. Randall,* 948 F.2d 388, 391 (1991).

The plaintiff's argue that there is a genuine issue of material fact as to whether the monitored calls substantially affected their ability to consult with their attorneys. However, the plaintiffs have submitted no evidence to support this claim. The evidence before the court demonstrates that despite the monitored calls, they were able to meet and confer with their attorneys at the Knox County Jail and also at court hearings. The plaintiffs have also presented no evidence that their ability to call their attorneys was limited on the monitored lines. The

motion for summary judgement is granted as to this claim.

**Claim # 9: Defendants Morris, Thompson and Knox County conspired to deprive the plaintiffs of their constitutional rights under §1983, §1985 and §1986.**

The defendants argue that the plaintiffs cannot demonstrate that the defendants engaged in a conspiracy to violate their constitutional rights because there is no evidence that the defendants violated any constitutional rights.  The defendants apparently assumed the court would grant their motion for summary judgment on all other claims and did not address this issue further. However, the plaintiffs cannot prove a conspiracy among these defendants.

 The defendants claim the plaintiffs have failed to demonstrate how Defendants Sheriff Thompson and Knox County are liable for any of their claims.  A defendant cannot be held liable under 42 USC §1983 unless the plaintiffs can demonstrate that the defendant caused or participated in the alleged constitutional violation. *McBride v. Soos*, 679 F.2d 1223, 1227 (7th Cir. 1982).

The plaintiffs say Sheriff Thompson is a proper defendant because he is the "warden of the Knox County Jail" and may be responsible for developing any of the customs, practices or policies in the jail.  However, the mere fact that a defendant was a supervisor is insufficient to establish liability because the doctrine of *respondeat superior* (supervisor liability) does not apply to actions filed under  42 USC §1983.  *Pacelli v. DeVito*, 972 F.2d 871, 877 (7th Cir. 1992).   For a supervisor to be held liable under 42 U.S.C. § 1983, he "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye. . ." *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988)**.**   The plaintiffs make no other mention of Defendant Thompson beyond his position as Sheriff.   Therefore, the court will dismiss this defendant.

The plaintiffs claim Knox County is a proper defendant because of the policies or lack of policies concerning medical care and the failure to train Defendant Morris. Liability under §1983 can be imposed on governmental entities only if the underlying constitutional deprivation resulted from the execution of an official custom, policy or practice. *Monell v. Department of Social Services*, 436 U.S.658, 694 (1978).  The plaintiffs did state some claims involving the policies and practices at the Knox County Jail concerning medical care and jail conditions.  For instance, the plaintiffs do have a surviving claim concerning the policy at the jail regarding newspapers. Therefore the plaintiffs will be able to proceed against Knox County on this claim.   However, the plaintiffs have not presented evidence of a custom, policy or practice for their surviving claims beyond a general allegation.  This is not sufficient.  The court will dismiss Defendant Knox County from all other claims.

Consequently, Defendant Morris cannot engage in a conspiracy by himself.  This motion for summary judgement is granted on the conspiracy claims.

CONCLUSION

24

The court has dismissed Defendant Sheriff Jim Thompson, and has dismissed the majority of claims against Defendant Knox County.  The defendants summary judgement motion is granted in part and denied in part as follows for each of the plaintiffs' claims:

Claim #1) *Defendants Morris, Thompson and Knox County were deliberately indifferent to the serious medical needs of Plaintiffs Holloway, Mabry, Judy and Kallenbach.*   The motion is granted as to all claims except Plaintiff Mabry's claim that Defendant Morris denied prescription medication for a painful ear injury.

Claim #2)  *Defendants Morris, Thompson and Knox County did not provide adequate heat, clothing,  food or grooming for the plaintiffs in violation of the Eighth Amendment.*  The motion for summary judgement is granted.

Claim # 3) *Defendants Morris, Thompson and Knox County failed to protect Plaintiff Mabry on July 8, 2004, when the plaintiff was handcuffed to another inmate with a history of assaults and mental illness.  The plaintiff was assaulted and injured.*  The motion for summary judgement is denied as to Defendant Morris only.

Claim #4) *Defendants Morris, Thompson and Knox County violated Plaintiffs Woods and Kallenbach's due process rights when they were placed in punitive segregation without any notice of the charge or formal hearing.*  The motion for summary judgement is denied as to Defendant Morris only.

Claim # 5) *Defendant Morris and Knox County retaliated against Plaintiffs Mabry, Kallenbach and Woods for either filing grievances or speaking to the media about jail conditions.*  The motion for summary judgement is denied as to Defendant Morris only.

Claim # 6) *Defendants Morris, Thompson and Knox County denied the plaintiffs meaningful access to the courts when they were denied all writing material and access to legal materials.*  The motion for summary judgement is granted.

Claim # 7) *Defendants Morris, Thompson and Knox County violated the First Amendment when they denied the plaintiffs access to all newspapers and media publications without any rational basis.*  The motion for summary judgement is denied as to Defendants Morris and Knox County.  The plaintiffs also claim they were denied access to media interviews.  The motion for summary judgement on this claim is granted.

Claim # 8*) All defendants violated the plaintiffs right to counsel by recording conversations between the plaintiffs and their counsel and making the tapes available to jail officials.  The plaintiffs allege the practice interfered with their ability to communicate with counsel.*  The motion for summary judgement is granted.

9) *Defendants Morris, Thompson and Knox County conspired to deprive the plaintiffs of their constitutional rights under §1983, §1985 and §1986.*  The motion for summary judgement is

25

granted.

**IT IS THEREFORE ORDERED that:**

**1) The defendants' motion for summary judgement is granted in part and denied in part as outlined above. [d/e 132]**

**2) The plaintiffs' surviving claims are as follows:**

> **a)  Defendants Morris was deliberately indifferent to the serious medical needs of Plaintiff Mabry when he was denied prescription medication for a painful ear injury.**
> **b) Defendants Morris failed to protect Plaintiff Mabry on July 8, 2004, when the plaintiff was attacked by another inmate with a history of assaults and mental illness.**
> **c) Defendants Morris violated Plaintiffs Woods and Kallenbach's due process rights when they were placed in punitive segregation without any notice of the charge or formal hearing.**
> **d) Defendant Morris retaliated against Plaintiffs Mabry, Kallenbach and Woods for either filing grievances or speaking to the media about jail conditions.**
> **e) Defendants Morris and Knox County violated the First Amendment when they denied the plaintiffs access to all newspapers and media publications without any rational basis**

**3) The defendants are to submit a well-supported second motion for summary judgement addressing the plaintiffs surviving claims.  The defendants must submit their second motion for summary judgement on or before November 9,  2007.  No continuances will be granted.  The plaintiffs must file a response on or before December 7,  2007.  No continuances will be granted.   The parties do not need to resubmit exhibits that were submitted with or in response to the first motion for summary judgement.  However, the parties must make clear reference to these documents by exhibit number.**

ENTERED this 18th day of September, 2007.

**s\Harold A. Baker**
_____
HAROLD A. BAKER
UNITED STATES DISTRICT JUDGE